Matter of Seaman's Socy. for Children & Families v Tanya V. (2005 NY Slip Op 50689(U))

[*1]

Matter of Seaman's Socy. for Children & Families v Tanya V.

2005 NY Slip Op 50689(U)

Decided on April 12, 2005

Family Court, Richmond County

Porzio, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 12, 2005

Family Court, Richmond County
In the Matter of the Application of Seaman's Society for Children and Families for the Custody and Guardianship of JONATHAN R., A Dependent Child Under Eighteen Years of Age
 against
Tanya V. and MICHAEL R., Respondents.
B-xxx/xx

Ralph J. Porzio, J.
On December 15, 2004 Petitioner, Seaman's Society for Children and Families (hereinafter referred to as the Agency) filed this petition for the termination of parental rights of Respondent Mother Tanya V. (hereinafter referred to as Respondent Mother) alleging that she abandoned and permanently neglected the subject child, Jonathan R., born October 25, 2000. The petition also alleged that the Respondent Father Michael R. (hereinafter referred to as Respondent Father) had abandoned and permanently neglected the subject child.
The child had come into the care of the Administration for Children's Services (hereinafter referred to as ACS) on or about May 9, 2002.
On January 10, 2005 the Respondent Father appeared with counsel. The matter was adjourned for service on the Respondent Mother. Substituted service was ordered on Respondent Mother. On March 2, 2005 service was complete as to the Respondent Mother. The Respondent Mother failed to appear and an inquest was conducted.
The trial was commenced on March 2, 2005 and completed on March 9, 2005.
FACTS
At trial only the Agency supervising caseworker, Shari R., and the Respondent Father testified.
Ms. R. testified that at least six months prior to the filing of the petition the Respondent Mother had contacted the Agency only on two separate occasions. Further, neither she nor anyone on her behalf sent any cards, gifts or letters.
As to the Respondent Father, Ms. R. testified that the Agency provided the Respondent Father with the name, address and telephone number of the foster parents of the child. Further, the [*2]Agency provided the Respondent Father with service plan reviews where the child's health and progress were discussed.
The Agency had facilitated visitation while the Respondent Father was housed at Riker's Island in East Elmhurst, New York. Ms. Richardson conceded that while the Respondent Father was incarcerated in various upstate New York correctional facilities no visitation between the Respondent Father and child occurred. Ms. Richardson testified, "Basically, I was when I first started on as supervisor, I was advised by my supervisor that the Agency wasn't required to facilitate visits that were fifty miles outside of the city limits." Tr. 3/2/05, p. 101, ll. 23-25, and p. 102, l. 2. The Respondent Father conceded that he did not expect the Agency or the foster parents to bring the child upstate for a jailhouse visit. The Respondent Father testified that he understood that the trip would be too difficult for such a young child. When questioned if he expected the child to be brought to an upstate New York visit he replied, "Well, I have made attempts, you know, I made attempts to have them bring him up. But I understood very well that, you know, he is young and the journey is pretty, you know, five hours. But, you know, I will also call before the court date." Tr. 3/9/05, p. 7, ll. 25-26, and p. 8, ll. 1-4.
Ms. R. further testified that the Respondent Father never offered a realistic plan for the child and that the child is doing well and residing with a pre-adoptive family.
The Respondent Father is currently incarcerated on a felony conviction for the sale of heroin and his earliest release date is April, 2006. The Respondent Father was arrested in late 1999 and has been incarcerated since 2000. He admits that this is his third felony conviction for the sale of heroin. When questioned how many felony convictions he had, the Respondent Father responded, "If - if you consider the Y.O., which is a youthful offender, yes, it's the third." Tr. 3/2/05, p. 33, ll. 6-8.
The Respondent Father testified that he maintained contact with the Agency through the prior caseworker, Ms. Stacy M.. He acknowledged being provided with the name, phone number and address of the foster parents caring for the child and he also maintained contact with the foster parents and child including visiting with the child while incarcerated at Riker's Island. These visits were arranged by both the foster parents and the Agency.
The Respondent Father testified that he had advised the Agency through letters that his sister and his father should be considered as resources for the child. However, the letters submitted by the Respondent Father contained no such references. Further, neither the Respondent Father's sister nor his father ever filed for custody.
The Respondent Father testified that his mother did file for custody. [FN1] However, her petition was dismissed.
The Respondent Father testified that his plan for the child was not to have his rights terminated. The Respondent Father stated: "My plan, Your Honor, is to prevent my rights being terminated." Tr. 3/9/05, p. 24, ll. 25-26.
 ISSUES PRESENTED
This Court determined the following issues: 1) whether the Petitioner exercised diligent [*3]efforts to reunite the Respondent Father with the subject child; 2.) whether the Respondent Father offered a realistic plan for the subject child; and 3.) whether the Respondent Mother abandoned the subject child.
DISCUSSION
Social Services Law § 384-b defines abandonment as: "a child is "abandoned" by his parent if such parent evinces an intent to forego his or her parental rights and obligations as manifested by his or her failure to visit the child and communicate with the child or Agency, although able to do so and not prevented or discouraged from doing so by the Agency. In the absence of evidence to the contrary, such ability to visit and communicate shall be presumed." Social Service Law § 384-b(5)(a).
At inquest the caseworker testified that six months preceding the filing of the petition the Respondent Mother made only two contacts to the Agency. Further, neither the Respondent Mother nor anyone on her behalf sent cards, letters or gifts. The Respondent Father had been in contact with the Agency and the foster parents.
Although the Respondent Mother had contacted the Agency twice, insubstantial and sporadic contact with the Agency will not negate a finding of abandonment. In re Kerry J., 288 AD2d 221, 732 N.Y.S.2d 430 (2nd Dept. 2001). Accordingly, a finding of abandonment was entered against the Respondent Mother and the cause of action of abandonment against the Respondent Father was dismissed.
Social Services Law § 384-b defines permanent neglect as: "a child who is in the care of an authorized Agency and whose parent or custodian has failed for a period of more than one year following the date such child came into the care of an authorized Agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the Agency's diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child." Social Services Law § 384-b (7)(a).
Diligent efforts is defined as: "reasonable attempts by an authorized Agency to assist, develop and encourage a meaningful relationship between the parent and child". Social Services Law § 384-b(7)(f). Diligent efforts on the part of the authorized Agency include arranging visitation, working with the parents to develop a plan for services for the child and family, providing services to assist in the return of the child and keeping the parents advised of the child's progress, development and health. Social Services Law § 384-b(7)(f).
Petitioner satisfied the diligent efforts requirement by providing the Respondent Father with service plan reviews where the child's health and progress was discussed. Furthermore, the Petitioner provided the Respondent Father with the name, telephone number and address of the foster parents who provided visitation for the Respondent Father and the child.
It should be noted that the Agency did facilitate some visitation for the Respondent Father and the child. However, the Agency failed to facilitate visitation when the Respondent Father was incarcerated in upstate New York correctional facilities stating that Agency policy did not require the facilitation of visits that were fifty miles outside of the New York City limits. Although the Respondent Father admitted that he did not expect the Agency to travel with the child as the long trip was extremely difficult for such a young child, that does not absolve the Agency's duty to facilitate visitation. The Agency still had a duty to provide visitation. Social [*4]Services Law § 384-b(7)(f)(5) specifically provides that an Agency is responsible for "making suitable arrangements with a correctional facility and other appropriate persons for an incarcerated parent to visit the child within the correctional facility, if such visiting is in the best interests of the child." Social Services Law § 384-b(7)(f)(5). Regardless of whether the Respondent Father was housed fifty miles away or not does not absolve the Agency's duty to facilitate visitation. 
This Court is troubled by the Agency's lack of efforts to facilitate visitation. Nevertheless, this Court does find that the Agency did satisfy the requirement of diligent efforts.
Social Services Law § 384-b(7)(c) defines planning for the return of the child as taking steps as "may be necessary to provide an adequate, stable home and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent".
The Respondent Father failed to offer any realistic plan for the child. The Respondent Father proferred his father, mother and sister as potential resources for the child. The Respondent Father's sister and father never came forward as resources to either this Court or the Agency and his mother's petition was dismissed.
This Court finds that the Respondent's true plan was to simply avoid the termination of his parental rights. His own testimony confirms this plan. He stated that the child could live with the foster parents until he was released from prison. Respondent Father's plan to have the child remain in foster care until his release is not appropriate. Matter of C. Children, 253 AD2d 554 (2nd Dept. 1998); Matter of Carmen N., 237 AD2d 607 (2nd Dept. 1997). 
This Court finds that the Agency did satisfy the diligent efforts requirement, the Respondent Father has permanently neglected the subject child and that it is in the best interests of the child to be adopted by the foster parents.
Accordingly, the parental rights of the Respondent Mother and Respondent Father are terminated.
FINDINGS
1.)This Court finds that the Petitioner made diligent efforts to assist, develop and encourage a meaningful relationship between the parent and child.
2.)This Court finds by clear and convincing evidence that the Respondent Father has
permanently neglected the subject child by failing to plan for the return of his child. 3.)This Court finds by clear and convincing evidence that the Respondent Mother has abandoned the subject child.
4.)It is in the best interests of the child to be adopted by the foster parents.
DECISION
This Court finds upon clear and convincing evidence that the Respondent Mother has abandoned the subject child and that the Respondent Father has permanently neglected the subject child. Furthermore, this Court finds that it is in the best interests of the child to be adopted by the foster parents.
This constitutes the decision and order of the Court.
Dated: Staten Island, New YorkE N T E R:
[*5]
April 12, 2005
RALPH J. PORZIO
Family Court Judge
Footnotes

Footnote 1: On August 14, 2003 the Respondent Father's mother filed a petition for custody for the subject child. A court ordered investigation revealed that the paternal grandmother had a history with ACS, had never met the child and resided in Puerto Rico. On or about September 22, 2003, after a hearing, the petition was dismissed.